IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

VICKY FAYE PARRISH,            )
    Plaintiff,                 )
                               )
        v.                )   Civil No. 3:13cv46 (JRS)
                               )
CAROLYN W. COLVIN,             )
Commissioner of Social Security, )
    Defendant.                 )
_____)

## REPORT AND RECOMMENDATION

Plaintiff is 52 years old and completed school through the eighth grade. She previously worked as a packer in a cookie factory. On June 27, 2011, Plaintiff applied for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"), alleging that she was disabled since June 1, 1991, due to dependent personality disorder, panic disorder, agoraphobia and major depressive disorder. Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's request for review on December 26, 2012.

Plaintiff now challenges the ALJ's denial of DIB from Plaintiff's alleged onset date of June 1, 1991, until Plaintiff's date last insured. Specifically, Plaintiff argues that the ALJ required the use of a medical advisor to assess Plaintiff's disability onset date, that the ALJ erred in assigning less than controlling weight to Plaintiff's treating physician's opinion, that substantial evidence did not support the ALJ's determination that Plaintiff was not disabled and that the ALJ failed to issue subpoenas to the relevant state agency consultants. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 13) at 4-8.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). This matter is before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.[1] The Court held oral argument on the motions on August 19, 2013. For the reasons set forth below, the Court recommends that Defendant's Summary Judgment (ECF No. 14) be DENIED and that Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED to the extent that the final decision of the Commissioner be VACATED and REMANDED for further consideration consistent with this opinion.

## I. BACKGROUND

Plaintiff challenges whether the ALJ erred in determining that Plaintiff was not eligible for DIB from her alleged onset date of June 1, 1991, until her date last insured on December 31, 1994. Therefore, Plaintiff's educational and work history, Plaintiff's relevant medical history, Plaintiff's non-treating state agency psychologists' opinions, Plaintiff's function report, Plaintiff's hearing testimony and oral argument proceedings are summarized below.

A.     Plaintiff's Education and Work History

Plaintiff was 34 years old when she applied for DIB and 31 years old on her date last insured. (R. at 61.) Plaintiff completed school through the eighth grade. (R. at 188.) She

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

previously worked as a packer in a cookie factory from 1981 until 1988 and was self-employed in the service industry from 1990 through 91. (R. at 188.)

B. Medical Records

1. Plaintiff's Medical Records before Plaintiff's Onset Date

Before Plaintiff's alleged onset date on November 17, 1983, Plaintiff was admitted to Tucker Pavilion due to her "acutely agitated depressed state" and increasing intensity of panic attacks. (R. at 386.) During her mental evaluation by Elliot Spanier, M.D., Plaintiff demonstrated fear, anxiety, panic, depression and signs of agoraphobic behavior. (R. at 386.) On November 18, 1983, Plaintiff underwent a psychological evaluation by T. Burwell Vaden, Jr., Ed.D., in which Plaintiff described suffering from panic feelings and nervousness. (R. at 384.) She felt depressed and did not like going out. (R. at 384.) Dr. Vaden noted that Plaintiff was alert and oriented, and that her mood was mildly depressed. (R. at 385.) Plaintiff suffered no thoughts of suicide, delusions or hallucinations, and her memory was intact. (R. at 385.) On December 12, 1983, Plaintiff was discharged from Tucker Pavilion and appeared ready for outpatient treatment, but could not return to work. (R. at 387.) Dr. Spanier prescribed Xanax and Imipramine. (R. at 387.)

On December 22, 1983, Plaintiff attended her first follow-up appointment after discharge with Lea K. Webb, A.C.S.W., L.C.S.W., and Plaintiff reported that she was doing well, but suffered one panic attack that she attributed to not taking her medicine that day. (R. at 393.) Plaintiff received a note for her employer that indicated that Plaintiff should not return to work until January 3, 1984. (R. at 393.) On January 6, 1984, Plaintiff followed-up with Dr. Spanier, who noted that Plaintiff was symptomatically better, but not "really able to return to work." (R.

3

at 394.) During Plaintiff's February 2, 1984 appointment with Ms. Webb, Plaintiff stated that

things were going well and she experienced only a few panic episodes. (R. at 394.) She

expressed fear about her abusive boyfriend. (R. at 394.) On February 7, 1984, Plaintiff

continued her conversation about her boyfriend and began to recognize the connection between

her fear and panic attacks and her abusive relationship. (R. at 394.) During Plaintiff's February

15, 1984 appointment, Plaintiff reported an incident in which her boyfriend struck her. (R. at

396.)

        Plaintiff visited with Ms. Webb on March 23, 1984, during which Plaintiff indicated that

she had not experienced a panic attack since her last visit and credited Xanax to helping her

sleep. (R. at 396.) On July 3, 1984, Ms. Webb telephoned Plaintiff, and Plaintiff indicated that

she suffered only "slight" panic attacks recently and believed that Xanax was working. (R. at

397.)

        On November 21, 1986, Plaintiff appeared at Ms. Webb's office on an emergency basis

after dropping out of her treatment following an incident at work. (R. at 397.) She was

depressed, withdrawn, worried, confused, disorganized and exhibited depressive symptoms. (R.

at 397.) She refused hospitalization and was prescribed Klonopin. (R. at 387.) During

Plaintiff's November 29, 1986 appointment, Plaintiff reported that the Klonopin did not work

and Dr. Spanier advised that Plaintiff could not return to work. (R. at 398.) On December 5,

1986, Dr. Spanier noted no dramatic changes in Plaintiff's condition, but Plaintiff's husband

indicated that Plaintiff seemed less depressed. (R. at 398.) She was less depressed overall

during her December 15, 1986 appointment and Dr. Spanier noted a definite improvement during

her January 2, 1987 appointment. (R. at 398.) Plaintiff was expressive during her January 9,

4

1987 appointment and Dr. Spanier recommended that Plaintiff could return to work the next week. (R. at 399.)

During Plaintiff's January 21, 1987 appointment, Plaintiff expressed that she had not returned to work and she discussed her controlling relationship with her husband. (R. at 399.) Plaintiff appeared stable during her February 4, 1987 appointment and still took Xanax three times each day. (R. at 399.) She experienced panic attacks, but some days she experienced more than others. (R. at 399.) On April 17, 1987, Plaintiff appeared "extremely depressed" and negative about everything. (R. at 399.) On April 22, 1987, Dr. Spanier responded to a letter from an attorney about a lawsuit that Plaintiff brought about against her employer in which Dr. Spanier listed panic disorder with agoraphobia, phobic disorder and major depression as Plaintiff's diagnoses. (R. at 400.) Dr. Spanier wrote that Plaintiff did well after her initial hospitalization in 1983 and worked for three years. (R. at 400.) Plaintiff's disorders were in remission until her incident in November 1986 and Dr. Spanier did not know how long before Plaintiff could return to work. (R. at 400.)

On May 7, 1987, Plaintiff was doing better, but still suffered panic attacks and demonstrated "jerking." (R. at 402.) Plaintiff indicated that she enjoyed herself while on her husband's fishing boat. (R. at 402.) During Plaintiff's June 1, 1987 appointment, Dr. Spanier cut back Plaintiff's Imipramine prescription and noted that Plaintiff continued to avoid crowded places. (R. at 402.) Plaintiff discussed wanting to go back to work. (R. at 402.) Dr. Spanier received a phone call from Plaintiff's husband, who reported that Plaintiff stopped taking her medication and was likely abusing drugs and alcohol. (R. at 402.) Dr. Spanier recommended hospitalization. (R. at 402.) Plaintiff returned to Dr. Spanier on July 22, 1987, and discussed

5

that she was hospitalized at West Brook. (R. at 403.) Plaintiff was drinking and became more depressed and more agitated. (R. at 403.) Dr. Spanier attributed this to alcohol withdrawal. (R. at 403.)

On September 2, 1987, Plaintiff continued to experience panic attacks and expressed a desire to attend counseling. (R. at 403.) During Plaintiff's October 20, 1987 appointment, Plaintiff was doing much better, which Dr. Spanier attributed to Plaintiff staying away from liquor. (R. at 403.) On December 8, 1987, Plaintiff reported that she was trying to go back to work at the cookie factory, but felt pressure to work the midnight shift. (R. at 403.) She asked for excuses to miss work. (R. at 403.) On April 18, 1988, Plaintiff reported feeling more depressed and noted that she stopped taking Imipramine. (R. at 403.) Dr. Spanier counseled Plaintiff to continue to take the Imipramine. (R. at 403.)

During Plaintiff's October 12, 1989 appointment, Dr. Spanier noted that Plaintiff was doing well and that her husband's business had done really well. (R. at 408.) On December 11, 1990, Plaintiff returned to Dr. Spanier with depression and possibly another physical problem. (R. at 408.) Dr. Spanier refilled Plaintiff's prescriptions and switched Plaintiff to Anafranil instead of Imipramine. (R. at 408.) On January 7, 1991, Dr. Spanier noted that Plaintiff was doing extremely well, that Plaintiff was not experiencing panic attacks and she was worried less. (R. at 408.)

### 2. Plaintiff's Medical Records from Onset Date through Date Last Insured

After Plaintiff's alleged onset date, Plaintiff returned to Dr. Spanier on February 29, 1992, complaining of feeling bad for the past three months and suffering lethargy, confusion, racing thoughts, depressed mood and withdrawal. (R. at 408.) During Plaintiff's March 12,

1992 appointment, Plaintiff indicated that she was more focused on Stelazine and stopped taking Imipramine four days before the appointment. (R. at 409.) Dr. Spanier warned Plaintiff that he did not want her on Stelazine for too long due to its side effects. (R. at 409.) Plaintiff's next appointment with Dr. Spanier was after her date last insured. (R. at 409.)

      C.     Non-treating State Agency Physicians' Opinions

      On August 24, 2011, Ralph Hellams, M.D. completed a Disability Determination. (R at 61-68.) After reviewing Plaintiff's medical records, her statements and the extent that her condition affected her ability to work, Dr. Hellams indicated that there was "insufficient evidence to make a determination of disability at or prior to [Plaintiff] last insured date." (R. at 67.) Further, Dr. Hellams noted that the evidence presented was not sufficient to evaluate Plaintiff's claims and that the proper evidence needed for a complete evaluation could not be obtained. (R. at 67.) Therefore, Dr. Hellams found that Plaintiff's "condition was not disabling on any date through December 31, 1994." (R. at 67.) Non-treating state agency physician Patricia Bruner, Ph.D., made the same determination on October 25, 2011. (R. at 77-78.)

      D.     Function Reports

      On July 30, 2011, Plaintiff completed a Function Report. (R. at 203-11.) Plaintiff noted that she lived in a house with her family. (R. at 204.) She reported that she woke up, went to the bathroom, brushed her teeth, washed her face, brushed her hair, drank coffee, went back to bed, watched television and spent the rest of her day in bed. (R. at 204.) She also did some chores. (R. at 204.) Plaintiff took care of her grandson, her husband and a small dog. (R. at 205.) Plaintiff's grandson cut the grass, went shopping and took out the trash for her. (R. at 205.)

Before her illness, Plaintiff noted that she could go on walks, shop, work, got to the beach and visit with friends and family. (R. at 205.)

Plaintiff had difficulty sleeping and woke up most nights. (R. at 205.) When she was up at night, Plaintiff typically went to Walmart. (R. at 205.) Plaintiff noted that she did not go out, so she did not dress herself and only bathed if she felt like it or had somewhere to go. (R. at 205.) Plaintiff enjoyed having her hair cut and colored and she shaved only her legs. (R. at 205.) She had no problem eating or using the toilet. (R. at 205.) Plaintiff needed reminders to take care of her personal needs, so she marked a calendar with her appointments and asked for reminders. (R. at 206.) She needed reminders to take her medications. (R. at 206.)

Plaintiff enjoyed cooking and prepared at least "one good meal daily." (R. at 206.) She typically cooked about an hour and a half each day. (R. at 206.) Plaintiff noted that sometimes she had difficulty cooking when depressed and sometimes she messed up the food. (R. at 206.) Plaintiff washed dishes, cleaned the beds, bathroom and floors, and did laundry about an hour each day. (R. at 206.) She needed motivation to do these things because of depression. (R. at 206.) Plaintiff did not perform yard work. (R. at 207.)

Plaintiff went out as little as possible, because she felt like everyone watched her. (R. at 207.) When she went out, Plaintiff would walk, drive or ride in a car, and she could go out alone. (R. at 207.) When she drove, she would try to get the things that she needed that would last a long time, and she would typically go when it was not as crowded. (R. at 207.) She shopped in stores and by telephone for food and medicine, which usually took about an hour. (R. at 207.) Plaintiff could not pay her bills, but could count change, handle her savings account and

use a checkbook. (R. at 207.) She noted that since her condition, she needed to look at prices and make lists, and sometimes she forgot where she put her money. (R. at 208.)

Plaintiff's hobbies included caring for her house plants and watching television. (R. at 208.) She noted that she lost interest since her condition began. (R. at 208.) She spent time with others, but this occurred rarely, because she mainly stayed to herself. (R. at 208.) She regularly went to get food, medicine and gas, and visited her mom. (R. at 208.) She needed reminders to go places and sometimes needed people to accompany her when going out, because she suffered panic attacks. (R. at 208.)

Plaintiff noted that her condition affected her ability to lift, squat, bend, stand, reach, walk, kneel, see, remember, complete tasks, concentrate, understand, follow instructions and use her hands. (R. at 209.) Plaintiff had no desire to do these things and complained that she is too weak. (R. at 209.) Her condition had no effect on her ability to sit, talk, hear, climb stairs or get along with others. (R. at 209.) She had no problem paying attention, was adequate at following written instructions and good at following spoken instructions. (R. at 209.) She could lift about five pounds. (R. at 209.) She got along with authority figures, but was not good at handling stress and changes in her routine. (R. at 210.) Plaintiff feared being caught off guard and losing her home. (R. at 210.)

E.    Plaintiff's Testimony

On October 16, 2012, Plaintiff testified, represented by counsel, before an ALJ. (R. at 26.) During the hearing, Plaintiff testified that she was 55 years old and had completed school through the seventh grade in special education classes. (R. at 32.) She alternated between living with her mother, ex-husband and daughter. (R. at 37.) Plaintiff could read some, including

9

newspaper articles and headlines, and could write simple notes. (R. at 33-34.) She had a driver's license and could read street signs. (R. at 33.) Plaintiff could perform simple addition and subtraction equations, but could not count change. (R. at 34.)

Plaintiff suffered depression and took Seroquel, Imipramine, Zoloft, Xanax, Lipitor and Nexium. (R. at 36.) She indicated that the medications worked, but she needed to visit the doctor for an update. (R. at 37.) Plaintiff could not leave her home, because of her depression and panic attacks. (R. at 37.) She experienced no difficulty sitting, standing or walking. (R. at 38.) Further, Plaintiff noted that she had no problem getting along with friends and family, including her ex-husband. (R. at 40.) She could follow spoken instructions and written directions with simple words. (R. at 40.) She used a cellphone, but could not use a computer. (R. at 40-41.)

Plaintiff explained that she watched reality television shows and could understand those shows. (R. at 41.) She could dress herself, shower, bathe, cook, do the dishes, sweep, launder clothes and vacuum. (R. at 41-42.) Plaintiff did not do yard work, because she did not go out, but she took out the trash. (R. at 42.) She could grocery shop sometimes if accompanied by her daughters or grandson. (R. at 42.) Plaintiff had a driver's license and could drive herself to appointments if she had a "good day." (R. at 42-43.) She went to Walmart, typically late at night to avoid other people. (R. at 43.)

F.     Oral Argument

At the request of Plaintiff's counsel, the Court held oral argument on the motions on August 19, 2013. During the hearing, Plaintiff argued that the record contained the *curriculum vitae* of the incorrect state agency physicians. Upon noting that the qualifications of Dr. Leslie

10

Montgomery, Dr. Patricia Bruner and Dr. Ralph Hellams were not included in the record, the Court asked Defendant to supplement the record to include the qualifications of the state agency physicians. On August 21, 2013, Defendant provided the Court and counsel for Plaintiff with the professional qualification statements of the state agency physicians Dr. Montgomery, Dr. Bruner and Dr. Hellams. (ECF No. 18).

## II. PROCEDURAL HISTORY

On June 27, 2011, Plaintiff filed an application for DIB due to disability dependent personality disorder, personality disorder, agoraphobia and major depressive disorder. (R. at 10.) Plaintiff alleged the disabilities beginning June 1, 1991. (R. at 10.) Plaintiff's claim was denied initially on August 25, 2011, and again on reconsideration on October 28, 2011. (R. at 10.) Plaintiff filed a written request for a hearing on December 8, 2011, and appeared with counsel before an ALJ on October 16, 2012. (R. at 10.) On October 22, 2012, the ALJ denied claimant benefits. (R. at 7, 10-17.) On December 26, 2012, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-3.)

## III. QUESTIONS PRESENTED

1. Did the ALJ err in assigning less than controlling weight to Plaintiff's treating physician's opinion?

2. Did the ALJ err by failing to obtain the assistance of a medical advisor?

3. Does substantial evidence support the ALJ's determination that Plaintiff was not disabled during the relevant time period?

4. Did the ALJ err by failing to issue subpoenas to the State Agency Physicians?

11

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted). To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted). If the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d

171, 177 (4th Cir. 2000). The analysis is conducted for the Commissioner by the ALJ and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[2] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and

---

[2]    SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

13

the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[3] based on an assessment of the claimant's Residual Functioning Capacity ("RFC")[4] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock,* 667 F.3d at 472-73; *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146, n.5). The Commissioner can carry his burden in the final step with the testimony of a Vocational Expert ("VE"). When a VE is called to testify, the ALJ's function is to pose

---

[3]   Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[4]   RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

14

hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

A.    The ALJ's Decision

Plaintiff appeared before the ALJ for a hearing on October 16, 2012. (R. at 10.) An impartial VE also appeared at the hearing. (R. at 10.) On October 22, 2012, the ALJ rendered his decision in a written opinion and determined that, based on the application for DIB on July 11, 2009, Plaintiff was not disabled under §§ 216(i) and 223(d) of the Act. (R. at 7-17.)

The ALJ followed the five-step sequential evaluation process as established by the Act in analyzing whether Plaintiff was disabled. (R. at 13); *see also* 20 C.F.R. § 404.1520(a). First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date to her date last insured of December 31, 1994. (R. at 12.) At step two, the ALJ determined that Plaintiff suffered severe impairments in the form of anxiety and depression. (R. at 12.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12); *see also* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

15

The ALJ determined that Plaintiff failed to meet the criteria of § 12.04(B) & (C).  (R. at 12-13.)  The ALJ assessed that Plaintiff had no restrictions with her activities of daily living and moderate difficulties in social functioning, concentration, persistence and pace, instead of marked limitations required to satisfy § 12.04(B).  (R. at 13.)  Plaintiff experienced no episodes of decompensation for an extended period of time and Plaintiff failed to meet the requirements set forth in § 12.04(C).  (R. at 13.)

At step four, the ALJ determined that Plaintiff had the residual functioning capacity through her date last insured to perform a full range of work at all exertional levels with nonexertional limitations.  (R. at 13.)  Plaintiff was able to understand, remember, and carry out short simple instructions, but was limited to brief superficial contact with the public.  (R. at 13.)  She could not perform production rate work, but could perform goal-oriented work.  (R. at 13.)

In reaching this conclusion, the ALJ considered objective medical evidence and opinion evidence.  (R. at 13.)  The ALJ afforded Plaintiff's treating physician's opinion little weight, as it was offered in hindsight and because there was no evidence that Plaintiff's physician treated Plaintiff during the relevant period.  (R. at 13-15.)  Further, the ALJ followed a two-step analysis as to whether the medically determinable physical symptoms could reasonably be expected to produce Plaintiff's pain and symptoms and, if so, the extent to which the symptoms limit Plaintiff's functioning.  (R. at 14-15.)  The ALJ concluded that, based on the evidence, Plaintiff's impairment could reasonably be expected to cause the alleged symptoms, but found Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms to lack credibility.  (R. at 15.)  Finally, at step five of the analysis, the ALJ concluded that Plaintiff was

capable of performing her past relevant work as a packer and that this work did not require activities precluded by her RFC. (R. at 16.)

Plaintiff moves for a finding that she is entitled to DIB from her onset date of June 1, 1991, until her date last insured on December 31, 1994, as a matter of law. (Pl.'s Mem. at 4-9.) Specifically, Plaintiff argues that the ALJ failed to obtain the assistance of a medical advisor. (Pl.'s Mem. at 4-5.) Plaintiff also contends that the ALJ erred in assigning less than controlling weight to Plaintiff's treating physician's opinion and that substantial evidence did not support the ALJ's determination. (Pl.'s Mem. at 5-9). Finally, Plaintiff argues that the ALJ erred in failing to issue subpoenas to the relevant state agency employees. (Pl.'s Mem. at 9-10.) Defendant asserts that a medical advisor was not required, that substantial evidence supports the ALJ's decision and that subpoenas were not necessary. (Def.'s Mem. at 13-19.) The Court held oral argument on the motions on August 19, 2013.

B. The ALJ's determination to assign less than controlling weight to Plaintiff's treating physician's opinions lacks the support of substantial evidence.

Plaintiff argues that the ALJ erred in affording little weight to Plaintiff's treating physician's opinions and great weight to the state agency physicians' opinions. (Pl.'s Mem. at 5, 7.) Specifically, Plaintiff argues that the ALJ relied upon an error in fact when discounting the weight afforded to Dr. Spanier's opinions. (Pl.'s Mem. at 5-6.) Defendant contends that any factual errors are harmless and, nevertheless, substantial evidence supports the ALJ's determination. (Def.'s Mem. at 20-21.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluation that have been ordered.

*See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions,

including those from the Plaintiff's treating physician(s), consultative examiners or other sources

that are consistent with each other, then the ALJ makes a determination based on that evidence.

*See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with

each other, or other evidence, the ALJ must evaluate the opinions and assign them respective

weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be

given controlling weight if it is well-supported by medically-acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record.

*Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not

require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the

physician opines on the issue of whether the claimant is disabled for purposes of employment (an

issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other

evidence, or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e).

Here, in finding a RFC that enabled Plaintiff to engage in work at all exertional levels

with nonexertional limitations, the ALJ was forced to reconcile divergent opinions offered by

Plaintiff's treating physician and those offered by state agency psychologists. In doing so, the

ALJ afforded little weight to the opinion of Plaintiff's treating physician and great weight to the

opinions of the state agency psychological consultants. (R. at 15.) In making this determination, however, the ALJ relied upon a factual error.

On November 19, 2008, Dr. Spanier opined that he had treated Plaintiff since 1983 (a 25-year time period), during which time Plaintiff was never symptom-free and spent most days housebound and unable to go outside. (R. at 359.) The ALJ assigned little weight to this opinion on the basis that the opinion was offered in hindsight and because "there was no evidence that Dr. Spanier treated [Plaintiff] from her alleged onset date through her date last insured." (R. at 15.) But this assertion was clearly wrong as ample medical records demonstrate that Dr. Spanier examined Plaintiff twice between June 1, 1991 and June 31, 1994 — the relevant period for which Plaintiff seeks DIB. And those examinations occurred after nearly a decade of other examinations, which is a far cry from an opinion offered merely with the benefit of hindsight.

Defendant argues that this error was harmless, citing to the Supreme Court's decision in *Shineski v. Sanders*, 556 U.S. 396 (2009), and further points out that the ALJ noted the two visits earlier in his opinion. (R. at 14; Def.'s Mem. at 18.) Therefore, Defendant opposes remand. The Court, however, disagrees and believes that remand must occur.

Resolution of this issue must begin with a discussion of the application of the harmless error rule in the Social Security Disability context. In *Sanders*, a case involving review of the denial of veterans' claims for disability benefits, the Supreme Court held that the harmless error rule applies in similar fashion in both the civil and administrative contexts. *Id.* at 407. Although the Fourth Circuit has yet to address the application of *Sanders* to Social Security Disability cases in a published opinion, the Court in two unpublished opinions has applied the harmless error doctrine when reviewing appeals denying benefits in Social Security cases. *See Garner v.*

19

*Astrue*, 436 F. App'x 224, 225 n.* (4th Cir. 2011) (unpublished) (finding drafting error to constitute harmless error); *Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished) (finding error by ALJ regarding time restrictions for sitting and standing to be harmless). Consequently, this Court believes that the harmless error rule set forth in *Sanders* applies to Social Security Disability appeals; indeed, this Court has repeatedly applied the harmless error rule in past Social Security appeals. *See Maitland v. Colvin*, 2013 WL 3788246, *12 (E.D.Va. July 18, 2013); *Phelps v. Astrue*, 2012 WL 6803711, at *9 (E.D.Va. Dec. 10, 2012); *Nelson v. Astrue*, 2012 WL 3555409, at *8-9 (E.D.Va. July 31, 2012).

Having determined that the harmless error rule applies, the question then becomes whether the error here was harmless. The burden establishing that the error was harmless rests on "the party attacking the agency's determination." *Sanders*, 556 U.S. at 409. As the Court in *Sanders* elaborated:

> To say that the claimant has the "burden" of showing that an error was harmful is not to impose a complex system of "burden shifting" rules or a particularly onerous requirement . . . . Often the circumstances of the case will make clear to the appellate judge that the ruling, if erroneous was harmful and nothing further need be said. But, if not, then the party seeking reversal normally must explain why the erroneous ruling caused harm.

*Id.* at 410. Thus, when reviewing a decision for harmless error, a court, among other things, must look at:

> an estimation of the likelihood that the result would have been different, an awareness of what body . . . has the authority to reach that result, a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings, and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference.

*Id.* at 411-12. And "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether reconsideration is necessary." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2010).

The error here cannot be harmless under this standard and remand must occur. The only explanation provided by the ALJ for his decision to give little weight to the multiple opinions of the treating physician Dr. Spanier rested upon this error, as the ALJ wrote: "The undersigned gave the multiple opinions of Dr. Spanier little weight because they were predictions in hind sight [sic], and there was no evidence that Dr. Spanier treated [Plaintiff] from her alleged onset date through her date last insured." (R. at 15.) And it bears repeating that, not only was this statement factually wrong, Dr. Spanier treated Ms. Parrish over a 25-year time period, including the two visits ignored by the ALJ.

In this Court's view, a factual error, such as the one here, that provides the sole basis for discounting multiple opinions from a treating physician — particularly one who treated the claimant for such a lengthy period — cannot be harmless. As the Supreme Court has acknowledged, in Social Security disability cases, "special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2002)). Indeed, the opinion of a treating physician is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (citing 20 C.F.R. § 416.927). However, if the ALJ finds that the treating physician's opinion conflicts with other substantial evidence, then the ALJ may afford the opinion "significantly less weight" due

to the "persuasive contrary evidence." *Hunter v. Sullivan*, 993 F.2d 331, 35 (4th Cir. 1992).

Thus, the import of the opinion(s) of a treating physician, particularly one who treated a claimant

for the length of time that Dr. Spanier treated the claimant here, cannot be overstated. And an

explanation provided by an ALJ rejecting a treating physician's opinion(s) that rests solely on a

factual error necessarily lacks the support of substantial evidence.

Although the Court must give deference to the ALJ's findings unless "the

[Commissioner] has committed a legal or factual error in evaluating a particular claim," *Sullivan

v. Hudson*, 490 U.S. 887, 885 (1989), upon finding that ALJ's decision is not supported by

substantial evidence or contains a factual error, it may affirm, modify or reverse the ALJ's ruling

with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g); *Radford v. Colvin*, 734

F.3d 288, 295 (4th Cir. 2013) (citing *Westmoreland Coal Co. v. Cochran*, 718 F.3d 319, 322 (4th

Cir. 2013)). Where the facts require a reweighing of evidence, courts have held that the proper

remedy is to remand the decision to the ALJ. *Radford*, 734 F.3d at 288; *Meyer v. Astrue*, 662

F.3d 700, 707 (4th Cir. 2011).

Defendant asks this Court to ignore the error here, arguing that substantial evidence

otherwise supports the ALJ's determination that Plaintiff was not disabled. But this Court agrees

with the Seventh Circuit's view that to do so:

> would defeat the entire purpose of harmless error, which is to ensure that the first-
> line tribunal is not making serious mistakes or omissions. When the decision of
> that tribunal on matters of fact is unreliable because of serious mistakes or
> omissions, the reviewing court must reverse unless satisfied that no reasonable
> trier of fact could have come to a different conclusion, in which even a remand
> would be pointless. In this context, an error in failing to analyze and explain
> important evidence is not harmless simply because the ALJ could have addressed
> that evidence in a way that would survive substantial-evidence review.

22

*Walters v. Astrue*, 444 F. App'x. 913, 919 (7th Cir. 2011) (unpublished) (internal citations and quotation marks omitted).

Other courts reviewing similar errors by ALJ's regarding treating physicians have also refused to find such errors to be harmless. *See, e.g., Minor v. Comm'r of Soc. Sec.*, 513 F. App'x. 417, 437-38 (6th Cir. 2013) (unpublished) (failure by ALJ to consider medical evidence violated treating physician rule and warranted remand because the error was not harmless); *Beck v. Colvin*, 2013 WL 5533571, at *7 (W.D.N.Y. Oct. 7, 2013) (factual error regarding continuous treatment by treating physician); *Pierce v. Astrue*, __ F. Supp. 2d __, 2013 WL 2179295, at *10-13 (W.D.N.Y. May 17, 2013) (factual error resulting in rejection of treating physician rule); *Anderson v. Colvin*, 2013 WL 1629156, at *2-3 (N.D. Ind. Apr. 15, 2013) (remand required due to factual error regarding lack of prescription for use of a cane by treating physician); *Short v. Comm'r of Soc. Sec.*, 2013 WL 1281639, at *2-5 (S.D. Ohio March 26, 2013) (multiple factual errors required remand); *Aceto v. Comm'r of Soc. Sec.*, 2012 WL 5876640, at *15-17 (N.D.N.Y. Nov. 20, 2012) (remand required due to ALJ's failure to properly develop record in support of refusal to afford controlling weight to opinions by treating physicians); *Hanes v. Comm'r of Soc. Sec.*, 2012 WL 4060759, at *13 (E.D.N.Y. Sept. 14, 2012) (remand necessary where ALJ overlooked medical treatment provided by treating physician); *LaBreque v. Astrue*, 2011 WL 285678, at *7 (D.N.H. Jan. 28, 2011) (factual errors regarding the number of times that treating physician saw claimant warranted remand); *Sojourner v. Astrue*, 2010 WL 4008558, at *7 (E.D. Pa. Oct. 12, 2010) (confusion by ALJ as to whether treating physician examined claimant during relevant time period warranted remand).

23

Therefore, the proper remedy here is to allow the ALJ to reweigh the evidence while considering all of Plaintiff's treatment during the relevant time. As the court in *Hanes* explained: "A conclusion by this Court that the factual error in this case was harmless would simply be speculation, and thus, remand is warranted to ensure that the ALJ fully considers this overlooked medical information in light of the entire record pursuant to the treating physician rule . . . ." *Hanes*, 2012 WL 4060759, at *1. Thus, the Court recommends that the case be remanded for clarification of any factual errors and reconsideration of the evidence on that basis.

C. The Court makes no determination as to whether medical advisor testimony is required to determine the onset of disability.

Plaintiff argues that, upon a finding that Plaintiff was eligible for SSI, the ALJ erred in failing to obtain the testimony of a medical advisor to establish Plaintiff's onset date. (Pl.'s Mem. at 4-5.) Defendant maintains that the ALJ was not required to consult a medical advisor, because the ALJ did not find that Plaintiff was disabled pursuant to Plaintiff's DIB claim. (Def.'s Mem. at 13-14.)

SSR 83-20 provides that the onset date must have a legitimate medical basis, requiring the support of substantial evidence. If the onset date must be inferred, SSR 83-20 requires the ALJ to enlist the opinion of a medical advisor "as the prescribed mechanism for reaching the required evidentiary threshold." *Bailey v. Chater*, 68 F.3d 75, 80 (4th Cir. 1995). However, SSR 83-20 requires that the ALJ consult a medical advisor *after* the claimant had proved he is disabled. SSR 83-20; *Bird v. Comm'r of Soc. Sec.,*699 F.3d 337, 344 (4th Cir. 2012) (emphasis added).

24

Because the Court finds that remand is required to reweigh the evidence to determine whether Plaintiff was disabled for DIB purposes and makes no determination as to whether Plaintiff is disabled, the Court can make no finding as to whether a medical advisor is necessary to determine the onset of Plaintiff's disability. Instead, the ALJ must make this determination in the first instance after properly re-weighing the evidence.[5]

## VI. CONCLUSION

For the reasons stated above, the Court recommends that Defendant's Motion for Summary Judgment (ECF No. 14) be DENIED and that Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED to the extent that the final decision of the Commissioner be VACATED and REMANDED for further consideration consistent with this opinion.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable James R. Spencer with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure**

---

[5]     Plaintiff also argues that the ALJ erred in failing to address Plaintiff's request to issue subpoenas or serve interrogatories regarding state agency personnel. (Pl.'s Mem. at 9-10.) Such requests are only required upon a showing that the information sought is "reasonably necessary for the full presentation of a case." Acquiescence Ruling 91-1(5) (2009). Indeed the ALJ addressed Plaintiff's request and indicated that such information sought was not necessary. (R. at 31.) Because the record is fully developed and the additional information sought from the state agency personnel is not necessary, the ALJ did not err in failing to serve interrogatories or issue subpoenas.

**shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

**by the District Judge except upon grounds of plain error.**

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: January 8, 2014